UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL M. RUBIN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 1:04-CV-836** |
| v. | : | |
| | : | |
| **FORD MOTOR COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

This matter is before the Court on Defendant's motion for summary judgment (Doc. 42), Plaintiff's response (Doc. 50), and Defendant's reply (Doc. 51).

### I. Procedural History

Plaintiff Michael Rubin, a citizen of Ohio, initially filed a complaint against Defendant Ford Motor Company in the Court of Common Pleas, Hamilton County, Ohio, on August 26, 2002. The case was removed to this Court. On November 13, 2003, this Court dismissed the complaint without prejudice for failure to prosecute.

Plaintiff filed this action against Defendant in the Hamilton County Court of Common Pleas on November 15, 2004. On December 20, 2004, Defendant removed the action to this Court, based on the Court's diversity jurisdiction. On December 21, 2004, Defendant filed a motion to dismiss for failure to state a claim. Defendant's motion was granted in part and denied in part. According to the Court's ruling on the motion to dismiss, Plaintiff's claims were limited to 1) intentional infliction of emotional distress; 2) failure to provide a safe work environment;

2

and 3) negligent retention.  Plaintiff's deposition was taken, and Defendant now moves for summary judgment on all claims.

Plaintiff has not submitted a highlighted version of Defendant's proposed findings of fact and conclusions of law as required by the Court's Order of March 7, 2005 (Doc. 12).  The Court therefore has gleaned the material facts from the parties' filings and the remainder of the record.

## II  Factual Background

### A. Undisputed Facts

On or about September 24, 1999, Plaintiff began working for Defendant in its plant in Louisville.  Defendant offered to transfer Plaintiff to a position as production supervisor in its transmission plant in Sharonville, Ohio, on October 5, 2000, which Plaintiff accepted.  Plaintiff and Defendant signed an employment agreement on October 9, 2000, setting the terms for Plaintiff's employment at the Sharonville Plant.  (Pl. Dep., Ex. 4.) The employment agreement stated that Plaintiff's employment was not for any definite term and that Plaintiff could be terminated at any time, regardless of Defendant's personnel policies or practices.  (*Id.*)  Plaintiff was terminated from his employment with Ford on September 4, 2002.  (Pl. Dep., p. 184.)  The parties have differing versions of the intervening events.  Each party's version of the intervening events is set out separately below.

### B. Defendant's Version

The following narrative describes Defendant's version of events between the time Plaintiff was hired and the time he was terminated and cites any supporting evidence in the record.

On May 14, 2001, Plaintiff threw a production part in frustration while at work.  Plaintiff

3

was disciplined and received one week off without pay. A "Disciplinary Action Notification" was delivered to Plaintiff concurrent with the suspension. (Pl. Dep., Ex. 10.)

On October 22, 2001, Plaintiff created a hostile work environment by provoking an argument with Myron Ingram, a co-worker, and by yelling and using profanities. Plaintiff was disciplined and received two weeks off work without pay. A "Disciplinary Action Notification" was delivered to Plaintiff concurrent with the suspension. (Pl. Dep., Ex. 11.)

On April 6, 2002, Plaintiff lied to his supervisors, Mr. Southall and Mr. Hull, about the whereabouts of Mr. Billups, an employee under the supervision of Plaintiff. The record includes emails describing the incident sent by Mr. Southall and Mr. Hull to Jim Brooks and Robert Brooks. (Pl. Dep., Ex. 13, Attachs. 1, 3.) This incident is also listed as an incident precedent to Defendant's decision to terminate Plaintiff in Jim Brooks' formal request for approval to terminate Plaintiff. (Pl. Dep., Ex. 13.)

On April 10, 2002, Plaintiff inappropriately confronted Mr. Southall by yelling, using profanities, and saying "F*** Ford Motor Company" after Mr. Southall did not allow Plaintiff to leave work to handle a family emergency. Defendant offers as evidence an email from Mr. Southall describing the incident and a note to file written by an unidentified person who interviewed Mr. Southall about the incident. (Pl. Dep., Ex. 13, Attachs. 4, 6.) This incident is also listed as an incident precedent to Defendant's decision to terminate Plaintiff in Jim Brooks' request for approval to terminate Plaintiff. (Pl. Dep., Ex. 13.)

At some time during April 2002, Plaintiff provided his computer password to Angela Waddle, an hourly employee, in violation of Ford policy. (Pl. Dep., pp. 104-110.) Plaintiff gave Ms. Waddle the password so that she could log the hours worked by certain Ford employees on

4

Ford's computer system. (*Id.*) Plaintiff admits that it was his responsibility to log these hours and that he was generally late in completing this task. (*Id.*) Defendant claims this policy was communicated to Plaintiff during a computer training session and has submitted a handout dated March 1996 (Pl. Dep., Ex. 8), which Defendant claims was given to Plaintiff during a computer training session that Plaintiff attended on February 21, 2002, prior to the time Plaintiff gave his password to Ms. Waddle. (Pl. Dep., pp. 112-116.) This document was in Plaintiff's possession and was turned over to Defendant from Plaintiff as part of a discovery request. (Pl. Dep., p. 114.) This incident is also listed as an incident precedent to Defendant's decision to terminate Plaintiff in Jim Brooks' request for approval to terminate Plaintiff. (Pl. Dep., Ex. 13.)

At some time prior to June 2002, Defendant investigated Plaintiff's complaint that Mr. Southall had inappropriately contacted Plaintiff at his home. (Doc. 42, p. 11.) Defendant disciplined Mr. Southall by giving him a demotion. (*Id.*) Defendant also assigned Plaintiff a different supervisor in a different area of the plant so that he and Mr. Southall would no longer be working together. (Doc. 42, p. 16.)

On June 26, 2002, Plaintiff committed insubordination and violated Ford policy by telling hourly employees that they could leave early or report late and he would cover for them as long as they got their work done. The record includes emails from Gary Moore relating Gene Johnson's discussion of this incident and Clyde Vance's discussion of this incident. (Pl. Dep., Ex. 13, Attachs. 13-14.) Mr. Johnson and Mr. Vance were present when Plaintiff made these remarks. The record also includes a form entitled "Proper Pay Practices," which outlines Ford's policies for payment of hourly employees. (Pl. Dep., Ex. 13, Attach. 17.)

On July 16, 2002, Plaintiff committed insubordination by cutting a deal with a union

5

representative in which he reduced the disciplinary penalty of one of his direct reports. The record includes an email from Gary Moore to Jim Brooks describing the incident. (Pl. Dep., Ex. 13, Attach. 16.) This incident is also listed as an incident precedent to Defendant's decision to terminate Plaintiff in Jim Brooks' request for approval to terminate Plaintiff. (Pl. Dep., Ex. 13.)

On July 18 and July 20, 2002, Plaintiff incorrectly scheduled the shifts for his department, failing to follow the instructions of his Superintendent. The scheduling mistakes threatened the operation of the entire assembly plant. The record includes two emails from Gary Moore describing the incidents. (Pl. Dep., Ex. 13, Attachs. 17-18.) This incident is also listed as an incident precedent to Defendant's decision to terminate Plaintiff in Jim Brooks' request for approval to terminate Plaintiff. (Pl. Dep., Ex. 13.)

Based upon the incidents listed above, Jim Brooks, a salaried personnel representative at the Sharonville Plant, recommended that Plaintiff be terminated from his employment. (Pl. Dep., Ex. 13.) Plaintiff was terminated on September 4, 2004. The termination meeting between Defendant and Plaintiff was without incident.

**C. Plaintiff's Version**

The following narrative describes Plaintiff's version of events between the time Plaintiff was hired and the time he was terminated and cites any supporting evidence in the record.

Plaintiff received very high scores on his first performance review at the Sharonville Plant. Plaintiff's first performance review occurred sometime in January of 2001. (Pl. Dep., pp. 71, 75.)

On March 15, 2001, Plaintiff first discovered inaccuracies with Ford's inventory records. (Pl. Dep., p. 144.)

6

On May 14, 2001, Plaintiff threw a production part and was given a week off without pay as a result. There is no factual dispute about this incident.

On July 31, 2001, Plaintiff first spoke with Bob Southall regarding the inventory irregularities. (Pl. Dep., p. 144.) This was the first conversation Plaintiff had with anyone at Ford regarding the inventory irregularities. (Pl. Dep., p. 145.)

On October 19, 2001, Plaintiff spoke with Merrill Hull for the first time about the inventory irregularities. (Pl. Dep., p. 145.) Plaintiff characterizes his reporting of irregular inventory practices to Mr. Hull and Mr. Southall as a catalyst event that eventually resulted in the subsequent problems during his employment, including his ultimate termination.

On October 22, 2001, Plaintiff confronted Myron Ingram, a fellow employee, for stealing Plaintiff's auto parts. Plaintiff threatened to inform the plant managers that Mr. Ingram had stolen parts. Mr. Ingram then approached Plaintiff and threatened to "kick his ass." Plaintiff told Mr. Hull about the incident, and Mr. Hull said he would fire Plaintiff if he ever caught him falsifying documents. (Pl. Dep., p. 81.) Plaintiff was disciplined by Defendant for this incident. Mr. Ingram was not disciplined. (Pl. Dep., pp. 75-77.)

Plaintiff attempted to email Bill Ford, Jr., to notify him about the inventory and production inconsistencies. (Pl. Dep., pp. 85-86.) Plaintiff produced to Defendant a printed copy of the email. (Pl. Dep., Ex. 5.) The email is undated. The recipient is "ford" (sic).

Plaintiff received a low score on his second performance review, which occurred in January of 2002. This review occurred after Plaintiff had started complaining about falsifying of company documents, theft of parts, and harassment. (Pl. Dep. 71-72, 75.)

On January 5, 2002, Plaintiff told Robert Brooks, a member of Ford's human resources

7

group, that Mr. Hull and Mr. Southall were "harassing pay for parts." (Pl. Dep., p. 158-59.)

On January 12, 2002, Mr. Southall called Plaintiff's house. (Pl. Dep., p. 194.) Plaintiff surreptitiously recorded the phone conversation. The transcript of the conversation shows that Mr. Southall urged Plaintiff to "drop it" or he and Plaintiff "would have a serious problem." (Pl. Dep., Ex. 12.) Mr. Southall also told Plaintiff he wanted him to tear up the paperwork Plaintiff possessed. Plaintiff filed a complaint against Mr. Southall. (Pl. Dep., p. 148.)

On April 6, 2002, Plaintiff gave incorrect information to his supervisors, Mr. Southall and Mr. Hull, about the whereabouts of Mr. Billups, an employee under the supervision of Plaintiff. Plaintiff claims that he did so because Mr. Billups had lied to him regarding his whereabouts. (Pl. Dep., Ex. 13, Attach 2.) Mr. Hull and Plaintiff got into an argument about the incident, during which Mr. Hull pointed his finger in Plaintiff's chest. (Pl. Dep., p. 203 & Ex. 13, Attach 2.)

On April 10, 2002, Plaintiff and Mr. Southall got into a heated confrontation about Plaintiff's request to leave work for the day. There are no factual disputes about this incident.

At some time during April 2002, Plaintiff provided his computer password to Angela Waddle, an hourly employee. (Pl. Dep., pp. 104-110.) It was common practice for supervisors to provide their employees with computer passwords. (Pl. Dep., p. 106.) If there was a Ford policy that supervisors should not provide passwords to their employees, that policy was never communicated to Plaintiff. (Pl. Dep., pp. 106-108, 112-115.) Ms. Waddle stated in an interview with an employee in Ford's Labor Relations Department that Plaintiff did not ask her to keep confidential that he had given her his password. (Pl. Dep., Ex. 13, Attach. 10.)

As a result of Plaintiff's complaint against Mr. Southall, Plaintiff was transferred out of

8

Mr. Southall's department some time prior to June 2002. (Pl. Dep., p. 212.)

From April 24, 2002 through June 22, 2002, Plaintiff went on medical leave due to anxiety and stress. (Pl. Dep., p.185.)

Plaintiff never told hourly employees that he would cover for them if they came in late or left early. (Pl. Dep., pp. 210-11.)

There are no factual disputes about the incidents on July 16, 2002 (Plaintiff cutting a deal with a union representative to reduce a disciplinary penalty) and July 18 and 20, 2002 (Plaintiff incorrectly scheduling a department's shift).

From July 27, 2002 through September 3, 2002, Plaintiff went on a second medical leave due to anxiety and stress. (Pl. Dep., p. 185-86.)

Plaintiff was terminated without incident on September 4, 2002. (Pl. Dep., pp. 120-21, 186.)

Plaintiff started having anxiety attacks in 2000 or 2001 as a result of the problems at work. (Pl. Dep., p. 255.) Plaintiff is taking the prescription drug Xanax to calm the anxiety. (Pl. Dep., pp. 5-6.)

### III. Summary Judgment Standard

The summary judgment procedure under Fed. R. Civ. P. 56 was designed to secure a just, speedy and inexpensive determination of any action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986). Rule 56(c) permits the Court to grant summary judgment as a matter of law, however, only after the moving party has identified as the basis of its motion "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of any genuine issue of material fact. *Id*. at

9

323, 106 S.Ct. at 2553.

The party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 88 S. Ct. 1575 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct.1598 (1970)).

The function of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id*. (citing *Cities Serv.*, 391 U.S. at 288-289, 88 S.Ct. at 1592). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84, 87 S. Ct. 1425, 1427 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, 88 S.Ct. at 1593, judgment may be granted. *Anderson*, 477 U.S. at 249-50, 106 S.Ct. at 2511.

10

## IV. Analysis

### A. Intentional Infliction of Emotional Distress

Plaintiff claims that Ford's "intentional, offensive and unjustified pattern of conduct (both verbal and physical) toward Plaintiff during his term of employment constitutes the intentional infliction of emotional distress under Ohio law." (Compl. ¶ 17.)

The Ohio courts have recognized intentional infliction of emotional distress as a tort. *Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983). The elements of a claim for intentional infliction of emotional distress are: 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it. *Pyle v. Pyle*, 11 Ohio App.3d 31, 34, 463 N.E.2d 98, 103 (1983).

In defining the type of conduct that rises to the extreme and outrageous standard, Ohio courts have relied on the following standard expressed in the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

11

*Reamsnyder v. Jaskolski,* 10 Ohio St.3d 150, 153, 462 N.E.2d 392, 394 (1984).

The Court finds that Plaintiff has not provided sufficient evidence for a jury to reasonably conclude that Ford's conduct was so extreme and outrageous as to constitute intentional infliction of emotional distress. It is extremely difficult for a plaintiff to satisfy the standard for intentional infliction of emotional distress, and it is "well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss." *Miller v. Currie*, 50 F.3d 373, 377-78 (6th Cir. 1995). It is also well-established under Ohio law that an employee's termination, even if based upon discrimination, does not rise to the level of "extreme and outrageous conduct" without proof of something more. *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999). "If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Id.*

While Plaintiff has not stated any discrimination claims, he has alleged that Ford's decisions to suspend and fire him were pretextual. Plaintiff's claim is therefore sufficiently similar to a discrimination claim so as to require that he produce proof of something more than pretext in order to show that Defendant's conduct rose to the level of extreme and outrageous conduct. The Court has examined the record for other facts that could support Plaintiff's intentional infliction of emotional distress claim. Aside from his allegations that Defendant suspended and terminated him for retaliatory reasons, the only evidence Plaintiff has presented that might support his claim is that he was poked and sworn at by his supervisors. However, these actions do not rise to the level of outrageous conduct required to constitute intentional infliction of emotional distress. *See Paolucci v. Robinson Memorial Hosp.*, No. 94-P-0022, 1995

12

WL 236743 (Ohio Ct. App. Mar. 10, 1995) (conduct included supervisor allegedly striking the plaintiff).

Thus, Plaintiff has not shown "something more" to sufficiently establish the extreme and outrageous conduct required to prevail on an intentional infliction of emotional distress claim. The Court therefore grants Defendant's motion for summary judgment on this claim.

**B. Failure to Provide a Safe Workplace**

Plaintiff claims that Defendant intentionally violated its duty to Plaintiff to provide a safe workplace by maintaining a racially hostile work environment in violation of Ohio Rev. Code § 4112.02 as well as other laws prohibiting discrimination and/or harassment. (Compl. ¶ 21.) Plaintiff claims that he reported the irregular inventory practices of an African-American co-worker, Myron Ingram, to his supervisors, who were also African-American. (*Id.*) He claims that his report was swept under the rug. (*Id.*) Plaintiff is a white/Caucasian male. (*Id.* ¶ 22.)

Ohio Revised Code § 4112.02 provides, in relevant part:

It shall be an unlawful discriminatory practice:
(A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Plaintiff has provided no evidence that any harm he may have suffered during his employment with Defendant was based upon the forms of discrimination prohibited by § 4112.02. Rather, the evidence in the record, particularly Plaintiff's deposition, shows only that employees of Defendant may have retaliated against Plaintiff for reporting inventory irregularities. There is absolutely no evidence that the hardships Plaintiffs claims to have endured in the workplace may have resulted from racial discrimination. Plaintiff has shown only

13

that he is white, and that the fellow employees with whom Plaintiff clashed were African-American. Such evidence alone does not support a hostile work environment claim under § 4112.02. There is no evidence of a violation of § 4112.02 in this case, and Defendant's motion for summary judgment on this claim is granted.

## C. Negligent Retention

Finally, Plaintiff claims that Defendant "negligently or intentionally allowed individual supervisory employees to remain in its employ" causing Plaintiff damages. (Compl. ¶ 27)

To prevail on a claim of negligent retention, Plaintiff must establish "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 739, 680 N.E.2d 161, 171 (1996).

Additionally, the Ohio Supreme Court has set forth the following requirement for a claim of negligent retention: "[A]n underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person, who then seeks recovery against the employer." *Strock v. Pressnell,* 38 Ohio St.3d 207, 217, 527 N.E.2d 1235, 1244 (1988). The Sixth Circuit has interpreted that statement in *Strock* to require that a plaintiff allege and prove that an employee is individually liable to the plaintiff for a tort in order to prevail on a claim of negligent retention against the employer. *Minnich v. Cooper Farms, Inc.*, 39 Fed.Appx.289, 295 (6th. Cir. 2002) (not published in Fed. Reporter).

14

To support his negligent retention claim, Plaintiff has identified three employees of Defendant whom he claims are individually liable to him in tort: 1) Mr. Hull for his "battery like 'poking' combined with insults and threats;" 2) Mr. Southall for his "abusive threats and continued dialogue;" and 3) Myron Ingram for his "continued falsification/theft of inventory documents." (Doc. 50, p. 10.)

First, Plaintiff has not presented sufficient evidence that Mr. Hull's "insults and threats" rise to the level of intentional infliction of emotional distress, as discussed above. Furthermore, the only evidence Plaintiff brings to support a battery claim is his testimony that Mr. Hull poked him in the chest on more than one occasion. Even if such poking constituted battery, Plaintiff does not present any evidence that Defendant had actual or constructive knowledge of these incidents. Thus, Defendant cannot be held liable for negligent retention of Mr. Hull. Second, Plaintiff has not presented sufficient evidence that Mr. Southall's "abusive threats" rise to the level of intentional infliction of emotional distress, as discussed above. Finally, Mr. Ingram's "continued falsification/theft of inventory documents" does not constitute a tort for which Defendant could be liable to Plaintiff.

For these reasons, the Court finds that Plaintiff has not presented a genuine issue of material fact with regard to the negligent retention claim. The Court therefore grants summary judgment in favor of Defendant on this claim.

15

**IT THEREFORE IS ORDERED** that Defendant's motion for summary judgment is **GRANTED** in its entirety.  Plaintiff's complaint is **DISMISSED** with prejudice at Plaintiff's cost.  This case is **TERMINATED** on the docket of the Court.

    **IT IS SO ORDERED.**

                                                           S/ Herman J. Weber
                                                        Herman J. Weber, Senior Judge
                                                          United States District Court

C:\Documents and Settings\maurydh\Local Settings\Temp\notes721D2D\~3941518.wpd